**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NICHOLE WILLIS and DARYL SIMONICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KALIBRATE PRICING INC., WAWA, INC., SPEEDWAY LLC, KWIK TRIP, INC., EG RETAIL (AMERICA), LLC, MURPHY OIL USA, INC., QUICK CHEK CORPORATION, and DOE CORPORATIONS 1-10,<br><br>Defendants. | Case No. ________________________<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

## NATURE OF THE ACTION

1. Fuel prices in the United States have reached unprecedented highs in the midst of a global energy crisis and ongoing military conflict with Iran. Drivers nationwide need relief. Instead, they have been paying a surcharge caused by an illegal algorithmic price-fixing scheme orchestrated by the pricing company Kalibrate Pricing Inc. ("Kalibrate") and some of the country's largest fuel retailers.

2. This artificial surcharge inflicts a severe, daily financial toll on millions of motorists who rely on their vehicles for basic necessities. Commuters should not struggle to afford the drive to work or to visit family. Delivery drivers, truck drivers, and ride-hailing drivers should not lose their hard-earned income to inflated gas prices.

3. The prices would be lower—if gas stations continued to compete for customers by aggressively undercutting one another's retail prices. Kalibrate's automated, algorithmic coordination, however, is replacing—and destroying—that historical retail competition.

4. Kalibrate provides the central nervous system for a conspiracy to extinguish retail price competition among gas stations: Kalibrate Fuel Pricing, an algorithmic, AI-based pricing system that connects directly to gas stations' pumps and signs. Instead of lowering prices to attract drivers, Kalibrate Fuel Pricing relies on the data of competing gas stations to coordinate high prices and wring more money from the pockets of everyday consumers throughout the markets where Kalibrate operates. Kalibrate Fuel Pricing thus facilitates collusion by enabling competing gas stations to avoid directly communicating but still coordinate prices and share information.

5. Kalibrate promises its gas-station customers that Kalibrate Fuel Pricing will enable them to avoid competing with other area stations and to charge higher prices to consumers—provided that the gas stations surrender their pricing decisions and competitively sensitive cost and volume data to Kalibrate's software. Kalibrate has even explained that its artificial intelligence checks pricing against rules that include "how to avoid eroding the market or initiating a price war."

6. In other words, gas stations share commercially sensitive and proprietary information with Kalibrate, which consolidates and synthesizes the data into price recommendations that automatically set gas prices, giving each station confidence that its inflated prices will not be undercut by competitors.

7. Defendants Wawa, Inc. ("Wawa"), Speedway LLC ("Speedway"), Kwik Trip, Inc. ("Kwik Trip"), EG Retail (America), LLC ("EG America"), Murphy Oil USA, Inc. ("Murphy Oil USA"), Quick Chek Corporation ("QuickChek"), and Doe Corporations 1-10 (collectively the "Gas Station Defendants") are among the gas station companies that have accepted Kalibrate's invitation to collude and use Kalibrate Fuel Pricing to make drivers pay more for each gallon of fuel.

8. For the Gas Station Defendants, this price-over-volume strategy—which existed well before the United States launched strikes against Iran and the Strait of Hormuz closed—has led to supracompetitive profit margins. For fuel consumers, the cost is staggering. Because of the volume of fuel sold across the forty-nine U.S. states excluding California, a single cent increase at the pump will drain over $1.2 billion from drivers' wallets every year across the country. While families struggle to afford the commute to work, Defendants have conspired to put an end to competition, joining an AI-powered trust to ensure that no matter where a driver turns, the price for gasoline is kept artificially high.

9. By entering into these agreements to outsource their pricing decisions to Kalibrate Fuel Pricing, Defendants have violated the Sherman Act, America's cornerstone antitrust law. This conduct constitutes a contract, combination, and conspiracy in restraint of trade—an agreement among competing fuel retailers, carried out through a common pricing agent, to fix, raise, and stabilize the price of a commodity.

10. Specifically, the Gas Station Defendants have replaced independent, competitive pricing with a coordinated, automated mechanism that relies on sensitive competitor data and a conscious decision to ensure that prices remain artificially high. These acts represent a modern, digital iteration of traditional price-fixing and combination that federal law expressly forbids.

11. What Kalibrate calls a "price war," economists call "competition." Plaintiffs bring this suit to put a stop to Defendants' unlawful combination and collusion, restore competition to the country's retail fuel markets, and make drivers whole by compensating them for the substantial overcharges Defendants have extracted from them through their illegal scheme.

**PARTIES**

12. Plaintiff Nichole Willis is a resident and domiciliary of Vineland, New Jersey. During the Class Period, Ms. Willis purchased gasoline at and directly from Wawa stations in and around Vineland, New Jersey, at which, upon information and belief, Kalibrate Fuel Pricing was in use.

13. Plaintiff Daryl Simonich is a resident and domiciliary of Canton, Ohio. During the Class Period, Mr. Simonich purchased gasoline at and directly from Speedway stations in and around Canton, Ohio, at which, upon information and belief, Kalibrate Fuel Pricing was in use.

14. Defendant Kalibrate offers pricing and location analytics software for a broad range of industries including retail, restaurant, retail fuel, grocery, healthcare, education, banking, private equity, and franchising. Kalibrate contracts with customers to license its fuel pricing and location intelligence software at transportation fuel retail locations across the Class Area.[1] Kalibrate is a Delaware corporation with its principal place of business in Livonia, Michigan. Kalibrate is a wholly owned subsidiary of Kalibrate Technologies Limited, a private limited company with its principal place of business in the United Kingdom.

15. Defendant Wawa owns and operates convenience stores and transportation fuel stations in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, Florida, and Washington, D.C., including stations in this District and in and around Vineland, New Jersey. Wawa operates its stations itself rather than through franchisees, so motorists who buy fuel at a Wawa station buy it directly from Wawa. Wawa is a New Jersey corporation with its principal place of business in Wawa, Pennsylvania, in Delaware County, within this District.

---

[1] As used herein, "Class Area" refers to the United States, excluding the State of California.

16. Defendant Speedway owns and operates convenience stores and transportation fuel stations across the Class Area under the Speedway and Speedway Express brands, including stations in this District and in and around Canton, Ohio. Speedway operates its stations itself, so motorists who buy fuel at a Speedway station buy it directly from Speedway. Speedway is a Delaware limited liability company with its principal place of business in Ohio. Speedway's sole member is SEI Speedway Holdings LLC, a Delaware limited liability company whose sole member is 7-Eleven, Inc., a Texas corporation with its principal place of business in Texas.

17. Defendant Kwik Trip owns and operates more than 850 convenience stores and transportation fuel stations, principally in Wisconsin, Minnesota, and Iowa.[2] Kwik Trip operates its stores itself rather than through franchisees, so motorists who buy fuel at a Kwik Trip station buy it directly from Kwik Trip. Kwik Trip is a Wisconsin corporation with its principal place of business in La Crosse, Wisconsin.

18. Defendant EG America owns and operates convenience stores and transportation fuel stations across the Class Area under approximately ten banners, including Cumberland Farms and Turkey Hill. EG America operates Turkey Hill-branded stations in Lancaster County, within this District. Motorists who buy fuel at a Cumberland Farms or Turkey Hill station buy it directly from EG America. EG America is a Delaware limited liability company with its principal place of business in Westborough, Massachusetts.

19. Defendant Murphy Oil USA owns and operates convenience stores and transportation fuel stations across the Class Area under the Murphy USA and Murphy Express brands, including, upon information and belief, the Murphy USA stations at 3220 Atlantic Boulevard NE and 4030 Tuscarawas Street W in Canton, Ohio. Motorists who buy fuel at a Murphy USA or Murphy Express station buy it directly from Murphy Oil USA. Murphy Oil USA is a Delaware corporation with its principal place of business in El Dorado, Arkansas. Murphy Oil

---

[2] *Making Food in House: The Business Case for C-Store Commissaries*, C-Store Dive (Oct. 29, 2025), https://www.cstoredive.com/news/c-store-commissaries-kwik-trip-weigels-eg-america/803566/.

USA is a subsidiary of Murphy USA Inc. ("Murphy USA"), which, through its subsidiaries, operated 1,757 retail stores in 27 States as of December 31, 2024.[3]

20. Defendant QuickChek owns and operates convenience stores and transportation fuel stations under the QuickChek brand in New Jersey and New York, concentrated in central and northern New Jersey. QuickChek is a New Jersey corporation with its principal place of business in Whitehouse Station, New Jersey. Motorists who buy fuel at a QuickChek station buy it directly from QuickChek. QuickChek is a subsidiary of Murphy USA, which acquired QuickChek in January 2021.[4] Murphy Oil USA and QuickChek are together the "Murphy USA Defendants."

21. Doe Corporations 1-10 are as-yet unidentified gasoline fuel retail companies operating in the United States (outside the State of California) and using Kalibrate Fuel Pricing. The Doe Corporations cannot be presently identified because Kalibrate keeps the identities of most of its Kalibrate Fuel Pricing customers and the locations of the gas stations using its software confidential. When these Doe Corporations are identified, Plaintiffs intend to add them via an amendment to the complaint or through any other appropriate procedure.

**JURISDICTION AND VENUE**

22. This Court has subject-matter jurisdiction over Plaintiffs' Sherman Act claim under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

23. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same conspiracy and form part of the same case or controversy as the Sherman Act claim.

24. Independently, this Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (d)(5)(B), and (d)(6), because this is a class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs; each proposed Class

---

[3] Murphy USA Inc., Annual Report (Form 10-K) (Feb. 2025), https://www.sec.gov/Archives/edgar/data/1573516/000157351625000010/musa-20241231.htm.

[4] Murphy USA Inc., Annual Report (Form 10-K), Ex. 21 (2026), https://www.sec.gov/Archives/edgar/data/1573516/000157351626000090/exh212025listofsubsidiarie.htm.

has more than 100 members; and at least one member of each Class is a citizen of a State different from at least one Defendant.

25. This Court has personal jurisdiction over each Defendant on Plaintiffs' Sherman Act claim under Section 12 of the Clayton Act, 15 U.S.C. § 22. Each Defendant has substantial contacts with the United States as a whole. Kalibrate markets and licenses Kalibrate Fuel Pricing to fuel retailers throughout the Class Area, and each Gas Station Defendant sells gasoline to motorists in multiple States at prices set or recommended by Kalibrate Fuel Pricing. Kalibrate also transacts business in this District: it licensed Kalibrate Fuel Pricing to Wawa, which is headquartered here, and, upon information and belief, Kalibrate Fuel Pricing has set or recommended the prices at Wawa, Speedway, and EG America stations here.

26. Defendants are also subject to personal jurisdiction in Pennsylvania. Wawa maintains its principal place of business in this District and is subject to general jurisdiction here. Speedway, EG America, and Murphy Oil USA are registered with the Pennsylvania Department of State to do business in Pennsylvania as foreign entities and have thereby consented to general personal jurisdiction in Pennsylvania. 42 Pa. Cons. Stat. § 5301(a)(2)(i), (a)(3)(i); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 134–36 (2023) (upholding general personal jurisdiction over a foreign corporation registered under § 5301 as consistent with due process). Kalibrate is also subject to specific jurisdiction under 42 Pa. Cons. Stat. § 5322(b), consistent with the Due Process Clause, because Plaintiffs' claims arise out of and relate to Kalibrate's contacts with Pennsylvania: Kalibrate licensed Kalibrate Fuel Pricing to Wawa, which, upon information and belief, made its fuel-pricing decisions using Kalibrate Fuel Pricing at its headquarters in this District, and those decisions set prices at the Wawa stations where Ms. Willis and other members of the New Jersey Subclass purchased fuel.

27. Because Plaintiffs' state-law claims arise from the same nucleus of operative facts as their Sherman Act claim, the Court may exercise pendent personal jurisdiction over each Defendant as to those claims. Each Defendant is also subject to personal jurisdiction in Pennsylvania because substantial acts in furtherance of the conspiracy occurred here, and each

Defendant knew or should have known of them. Upon information and belief, Wawa made its fuel-pricing decisions using Kalibrate Fuel Pricing, and supplied its non-public data to Kalibrate, from its headquarters in this District, and Kalibrate Fuel Pricing set or recommended the prices at Wawa, Speedway, and EG America stations in this District. Each Gas Station Defendant, including Kwik Trip and QuickChek, supplied its data to Kalibrate understanding that Kalibrate would process that data in conjunction with data from other Kalibrate customers, and Kalibrate publicly identified Pennsylvania-based Wawa as one of those "fuel retail clients" in May 2021. QuickChek also competes directly with Wawa in New Jersey, including at the same intersection in Monroe Township.

28. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). Wawa resides and is headquartered in this District, and, upon information and belief, Wawa made its fuel-pricing decisions, including its decision to use Kalibrate Fuel Pricing, here. Kalibrate, Wawa, Speedway, and EG America transact business in this District: Wawa, Speedway, and EG America operate retail fuel stations here, and Kalibrate licensed Kalibrate Fuel Pricing for use at stations here. A substantial part of the events giving rise to Plaintiffs' claims occurred in this District. And each Defendant resides in this District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction here with respect to this action.

29. Defendants' conduct took place in and substantially affected interstate commerce. Kalibrate licenses Kalibrate Fuel Pricing to fuel retailers throughout the Class Area and transmits price recommendations and competitively sensitive data across state lines, and the Gas Station Defendants sell gasoline at stations in multiple States, priced through Kalibrate Fuel Pricing.

## FACTS

### I. Gasoline-Powered Vehicles Are a Pervasive and Expensive Part of Life for Americans

30. The United States economy and the daily lives of its roughly 210 million licensed drivers residing in the Class Area are inextricably tied to cars. Throughout much of the country, American car culture remains a dominant reality, with approximately 228 million gasoline-

powered passenger vehicles currently on the road. For the vast majority of Americans, fueling their vehicles is not a discretionary purchase. It is a mandatory expense required to access work, school, and basic services. Indeed, each year, American drivers in the Class Area consume 115.2 billion gallons of gasoline and 41.4 billion gallons of diesel.[5]

31. The retail fuel landscape in the Class Area also is dominated by a handful of multinational conglomerates. This concentration is intentional. It was a calculated effort by the industry's largest participants to gain the scale and market density necessary to move away from competition and toward a profit-extraction strategy. These giants—including the Gas Station Defendants—now collectively control a substantial share of the gas stations on many of the prime corners and high-traffic highway corridors across the Class Area.

32. As these dominant players in retail fuel looked for ways to extract value and avoid the race to the bottom that characterizes competitive markets, they increasingly turned to sophisticated technology to manage their vast networks.

33. Historically, retail pricing for gasoline has been fiercely competitive. Gas stations would seek to attract customers by undercutting the prices of other nearby gas stations. Gas stations thus would chase one another's prices down as far as they were able (taking account of their costs), in the hope of convincing more drivers to fuel at their pumps. This competition was intense enough that gas stations would adjust prices even by tenths of a cent to make their fuel appear cheaper than the station across the street. This downward retail price competition benefits consumers by resulting in lower prices for gasoline for their vehicles. But when consumers pay less for fuel, gas stations earn lower profits on each gallon of fuel sold.

34. Kalibrate offers gas station operators a tool to avoid this retail price competition and make drivers pay more: Kalibrate Fuel Pricing.

---

[5] Fed. Highway Admin., U.S. Dep't of Transp., *Highway Statistics 2024*, tbl. MF-27 (Highway Use of Motor Fuel – 2024), https://www.fhwa.dot.gov/policyinformation/statistics/2024/pdf/mf27.pdf (reporting national highway use of 127,278,127,000 gallons of gasoline and 44,533,935,000 gallons of special fuels, of which California accounted for 12,119,277,000 and 3,145,336,000 gallons, respectively).

## II. Kalibrate Fuel Pricing Is Designed and Marketed to Eliminate Fuel Price Competition Between Gas Stations

35. Kalibrate Fuel Pricing is software based on a common pricing algorithm that sets fuel prices at the pump for Kalibrate's gas station customers. It connects a gas station's pumps and signage to Kalibrate's central Pricing Cloud. Kalibrate Fuel Pricing's algorithm then automatically sets the gas station's fuel price at its pumps, signage, and points of sale. Kalibrate describes Kalibrate Fuel Pricing as offering "a flexible rules engine, and more than 100 rules and validations," and states that "Kalibrate's patented machine learning models recommend optimal fuel prices."[6] Kalibrate Fuel Pricing connects to each customer's "POS, pumps, price signs, data warehouses, or Business Intelligence tools," so that customers can "apply prices directly to POS systems" and "update sites in bulk."

36. Kalibrate's marketing proposition is straightforward: Kalibrate tells its customers that by surrendering their fuel price decisions to Kalibrate Fuel Pricing, they will increase their margins and profits on fuel sales. Kalibrate's advertising materials make clear that Kalibrate Fuel Pricing achieves these higher prices by collecting data about all of an area's competitors and then implementing a common pricing algorithm that coordinates its users to refrain from competing on price.

### *A. Kalibrate Fuel Pricing Relies on Users Abdicating Control of Pricing to a Common Pricing Algorithm*

37. Kalibrate warns its customers (*i.e.*, gas stations) that if they do not rely on its automated pricing, they will be limited in the benefits they can achieve and may even cause unnecessary price volatility for themselves and their competitors. In its promotional materials, Kalibrate offers its users lighthearted advice on "[h]ow to overcome fuel price automation anxiety[.]"[7] Kalibrate has asked prospective customers directly: "And how will you feel giving up

---

[6] Kalibrate, *Kalibrate Fuel Pricing Software*, https://kalibrate.com/kalibrate-fuel-pricing-software/ (last visited Nov. 17, 2026).

[7] Simon Martin, *How to Overcome Fuel Price Automation Anxiety*, Kalibrate (Sept. 16, 2021), https://web.archive.org/web/20240223104254/https://kalibrate.com/insights/blog/fuel-pricing/automation-anxiety/ (archived Feb. 23, 2024).

some control over pricing tactics?" It has told them that once automation takes routine pricing decisions out of their hands, their analysts "will be able to throw their full weight behind those more difficult pricing decisions."[8]

38. Kalibrate also makes clear to its potential customers that, where customers have allowed its algorithm to take over pricing decisions, "there is **less fluctuation** and **gross margins have increased significantly** and are now more predictable."

39. Although gas station operators can manually override Kalibrate Fuel Pricing, Kalibrate boasts in its marketing materials that in practice its users surrender as much as 90% of their pricing decisions to its algorithm. Thus, Kalibrate's customers delegate nearly all of their pricing decisions to Kalibrate Fuel Pricing. This nearly absolute delegation and automation are core to Kalibrate Fuel Pricing's value proposition. Kalibrate tracks as "one critical metric in Kalibrate Fuel Pricing" a customer's "auto-implementation rate, which indicates how often a retailer" lets the system implement price changes automatically, and it describes customers that translate their strategy into Kalibrate and then "have prices pushed automatically to their sites." Kalibrate's automated system determines the optimal price after accounting for the retailer's price position, volume and margin targets, price-movement constraints, and "what the site down the road is doing." Kalibrate presents automation as the remedy for slow reaction to rivals' prices: it described a client whose "pricing window was 2hrs after receiving their major competitor price feed," and explained that "the delay meant they were reacting too slowly to market movements and losing revenue."[9]

---

[8] Ian Thompson, *7 Ways Automated Pricing Processes Help Boost Fuel Profits*, Kalibrate (May 17, 2017), https://www.kalibrate.in/intelligence-hot-topics/2017/5/18/7-ways-automated-pricing-processes-help-boost-fuel-profits.

[9] Jo Bernard, *The Power of People: Improving Fuel Pricing Outcomes with Data*, Kalibrate (Mar. 26, 2025), https://kalibrate.com/insights/blog/the-power-of-people/; Anila Siraj, *Part 2: How Artificial Intelligence and Machine Learning Fit into Your Fuel Pricing Strategy*, Kalibrate (Nov. 2, 2017), https://www.kalibrate.in/intelligence-hot-topics/2017/12/6/part-2-how-artificial-intelligence-and-machine-learning-fit-into-your-fuel-pricing-strategy.

40. Kalibrate also actively steers its customers toward surrendering pricing review to the algorithm. Kalibrate's published "fuel pricing maturity curve" describes its most advanced, "Optimized" stage as one in which retailers "use sophisticated AI to generate prices," "[d]ata is automatically fed into the system daily," and "[o]ver 80% of prices are accepted without manual review."[10] A companion Kalibrate publication identifies as a "next step" for retailers to "[e]nsure at least 80% of prices are automated and trusted without review."[11]

41. EG America, like the other Gas Station Defendants, operates a network of fuel stations and convenience stores throughout the United States and has turned over its pricing to Kalibrate Fuel Pricing's algorithm. According to Kalibrate, EG America's fuel pricing team, based in Westborough, Massachusetts, "is responsible for pricing fuel at over 1,600 fuel and convenience outlets, operating under 10 banners, across 31 states," and "EG America's entire network transitioned to Kalibrate's centralized Pricing software." EG America's pricing personnel now work "in an analytical capacity."[12] In a testimonial on Kalibrate's website, EG America's Manager of Retail Petroleum Pricing said: "I have a great deal of faith and fidelity in the system, that our pricing decisions are being made automatically . . . ."

### ***B. Kalibrate's Customers Use Kalibrate Fuel Pricing Not to Compete, But to Coordinate Price Increases***

42. In a competitive market, gas stations use information about competitor pricing to undercut one another's prices and attract consumers. But Kalibrate tells its users that with Kalibrate Fuel Pricing, they can do the opposite: Kalibrate Fuel Pricing uses public ***and*** non-public data funneled from competing gas stations in an area to help its users to instead coordinate and charge higher prices to consumers.

---

[10] Jo Bernard, *Climbing the Fuel Pricing Maturity Curve: A Guide to Improving Your Fuel Pricing Strategy*, Kalibrate (June 13, 2024), https://kalibrate.com/insights/blog/climbing-the-fuel-pricing-maturity-curve/.

[11] Kalibrate, *Navigating the Fuel Pricing Maturity Curve: A Path to Excellence with Kalibrate*, MobilityPlaza (July 29, 2024), https://www.mobilityplaza.org/news/38382.

[12] Kalibrate, *EG America Boost Fuel Pricing Efficiency with Kalibrate Pricing*, https://kalibrate.com/insights/client-stories/eg-america-boost-fuel-pricing-efficiency-with-kalibrate-pricing/ (last visited Sept. 3, 2026).

43. Kalibrate Fuel Pricing is widely used in the United States. Kalibrate wants its customers to know that other gas stations in their markets also use Kalibrate Fuel Pricing to maintain higher prices: It advertises that Kalibrate Fuel Pricing sets fuel prices for "8 of the top 10 fuel retailers in the USA," and for 14 of the top 20 convenience store chains. Kalibrate's fuel-industry webpage now states that "15 of the top 20 fuel retailers in the US use Kalibrate" and that "760000 fuel prices [are] delivered daily through our software."[13] Kalibrate further reports that its software delivers 8.3 million fuel prices each month to more than 28,000 actively priced sites.[14]

44. Kalibrate expects, and tells its customers, that their competitors also use Kalibrate's pricing software. As of January 2026, Kalibrate's published Fuel Price Optimization FAQ posed the question, "What if my competitors also use Kalibrate's AI?" and assured customers that, in that event, "there's no risk of an endless 'AI pricing battle.'"[15] Its answer confirms to each customer that, if the customer's rivals also use Kalibrate, the customer need not fear a price war with them. As alleged below, Kalibrate began making categorical public assurances that its customers share no data or models only after regulators began investigating it.

45. This is because coordination among gas stations using Kalibrate Fuel Pricing is important to the value Kalibrate delivers. If only one gas station in an area uses Kalibrate Fuel Pricing to raise prices, customers may divert to its lower-priced competitors for fuel, as true competition ordinarily works. But if multiple competitors use Kalibrate Fuel Pricing to raise prices together in an area, consumers run out of low-priced options, and the gas stations can increase prices without losing so much volume that the increase becomes unprofitable.

46. Kalibrate purposely markets Kalibrate Fuel Pricing as a way for its customers to avoid competing with one another on price. Kalibrate urges on its website that even in the face of

---

[13] Kalibrate, *Fuel Industry Pricing and Location Intelligence*, https://kalibrate.com/industries/fuel-convenience/ (last visited Nov. 17, 2026).

[14] *Kalibrate Fuel Pricing Software*, *supra* note 6.

[15] Kalibrate, *Fuel Price Optimization*, https://web.archive.org/web/20260123110717/https://kalibrate.com/kalibrate-fuel-pricing-software/fuel-pricing-optimization-ai/ (archived Jan. 23, 2026).

"falling oil prices . . . it's critical to avoid a race to the bottom." Kalibrate tells its customers that they should work together to increase their profits on the backs of drivers: "Your competitors look to you to set the prices and will just modify their prices accordingly." Kalibrate warns its customers that price competition is harmful to both their profits and their competitors' profits: "If you're the influencer in that market, you could be making a change that triggers a downward spiral and has negative implications for everyone operating in that market." Kalibrate tells potential customers in its promotional materials that trying to drop prices to drive volume over a short period of time is "largely a waste of time." In a white paper titled "The Logic of Price Testing," Kalibrate explained that, because competitors follow the retailer's lead, a price test "is not so much of a concern if you're testing upwards, but if you're testing downwards, you run the risk of degrading the margin for no gain." The same white paper recommends twelve-week price tests because that period "gives enough time for consumer perception to be altered and for your competition to notice and respond to your change in price position."[16] Kalibrate thus instructs its customers to treat price increases as low-risk experiments, to avoid price reductions that rivals will match, and to hold higher prices long enough for competitors, many of whom also use Kalibrate Fuel Pricing, to see and follow them.

47. Kalibrate has delivered the same message for a decade. In a November 2016 article, Kalibrate explained that when retailers start matching lower prices, "the death spiral begins," a chase to the bottom in which margins collapse without any retailer gaining volume, and concluded that "a price drop across the board is not the most effective volume-generating move!"[17]

48. Avoiding price competition is built into Kalibrate's algorithm itself. Kalibrate has explained that, in fuel pricing, "[a]rtificial intelligence is the act of performing checks based on

---

[16] Kalibrate, *The Logic of Price Testing* (captured July 31, 2023), *reproduced in* Affidavit of Alexander Jokic ¶¶ 31–33 & Ex. F, *Comm'r of Competition v. Kalibrate Can. Inc.*, No. T-1778-24 (F.C. July 11, 2024), *reprinted in* Application Record, https://antimonopoly.ca/wp-content/uploads/2025/06/T-1778-24-Application-Record.pdf.

[17] Ian Thompson, *Expert Insight: The Race for Volume, Part 1: Pricing*, Kalibrate (Nov. 9, 2016) (originally published in CSP Daily News), https://www.kalibrate.in/intelligence-hot-topics/2016/11/14/expert-insight-the-race-for-volume-part-1-pricing-1.

these rules to produce a price that is optimal," and it listed among those rules: "You will need to consider how to avoid eroding the market or initiating a price war."[18]

49. Kalibrate has continued to deliver this message during the Class Period. In September 2024, Kalibrate advised fuel retailers to limit the number and extent of their daily price changes "[t]o avoid triggering competitor price wars and market volatility." In June 2025, Kalibrate told retailers that, "[i]nstead of always matching or undercutting the lowest pump price," they should use Kalibrate Fuel Pricing's "brand sensitivity" insight to "[i]dentify which competitors are truly influencing your customers," so that they can avoid reacting to rivals' prices that do not affect their volume.[19]

50. Kalibrate makes clear in its advertising that Kalibrate Fuel Pricing can help customers to avoid this downward price competition with other gas stations. By using Kalibrate Fuel Pricing to set prices instead of relying on gas station operators' analog, emotional, and competitive instincts, Kalibrate tells its customers they can work together to keep prices high even at times when wholesale prices are falling. By keeping prices high across the market, Kalibrate Fuel Pricing enables gas stations to "see more long-term success . . . than by sacrificing margin in an attempt to draw volume":

[18] Siraj, *supra* note 9.

[19] Jo Bernard, *Maximizing Profitability for Small Gas Station Chains*, Kalibrate (Sept. 11, 2024), https://kalibrate.com/insights/blog/maximizing-profitability-for-small-gas-station-chains/; Jo Bernard, *Rethinking Fuel Pricing Strategy as Sales Decline*, Kalibrate (June 19, 2025), https://kalibrate.com/insights/blog/rethinking-fuel-pricing-strategy-as-sales-decline/.

# Don't get caught up in panic

While fuel markets are currently experiencing sudden, unexpected volatility, it's important to find efficiencies where you can — now more than ever.

While falling oil prices are never reflected as quickly on the forecourt as the press would like, supermarkets are already beginning to slash prices. But it's critical to avoid a race to the bottom. Take a step back to evaluate your network. You'll see more long-term success by doing this than by sacrificing margin in an attempt to draw volume.

51. Kalibrate published the "race to the bottom" passage quoted above in an article by the "Kalibrate Team" dated November 4, 2020. The article promoted replacing manual fuel pricing with automation and asked retailers: "How quickly are you alerted to competitor price changes?" It told them to "[e]mploy an elasticity model to strike the balance between not dropping the price too quickly, and not being seen to lag behind."[20] The article remained publicly available on Kalibrate's website through at least April 19, 2024, when the Competition Bureau of Canada captured it.[21]

52. Kalibrate provides its customers with much more than high-level suggestions about how to use Kalibrate Fuel Pricing to coordinate durable high prices with one another. Kalibrate Fuel Pricing takes into account all of the competing gas stations in a market and optimizes prices to meet a given gas station's target margin. Kalibrate Fuel Pricing achieves this outcome by using a vast set of public and nonpublic pricing and volume data to identify to its customers how other gas stations would adjust their prices in reaction to a customer's own price shift. By incorporating competitors' reactions into its automated price-setting, Kalibrate Fuel Pricing enables the gas stations in a given market to work collectively to "squeeze out profit" across the market by keeping

---

[20] Kalibrate Team, *How Much Is Your Company's Fuel Pricing Costing?*, Kalibrate (Nov. 4, 2020), https://web.archive.org/web/20210319170657/https://kalibrate.com/insights/blog/fuel-pricing/how-much-is-your-fuel-pricing-costing-you/ (archived Mar. 19, 2021).

[21] Affidavit of Alexander Jokic ¶¶ 29–30 & Ex. E, *Comm'r of Competition v. Kalibrate Can. Inc.*, No. T-1778-24 (F.C. July 11, 2024), *reprinted in* Application Record, https://antimonopoly.ca/wp-content/uploads/2025/06/T-1778-24-Application-Record.pdf, at 13–14, 132–35.

prices artificially high together.[22] Coordinating price changes with nearby competitors is built into Kalibrate's model:




53. Kalibrate Fuel Pricing's interface displays each customer's site alongside selected competitor sites and, according to a Kalibrate spokesperson, tracks "competitor sensitivities," ranking competitor sites by how sensitive they are to the customer's price changes. In a Kalibrate demonstration video, the presenter explained that "[b]ehind the scenes, the system is really designed to automate as much of that pricing process as it possibly can."[23]

54. The price effect of fuel retailers switching to Kalibrate Fuel Pricing is significant and immediate. Research on algorithmic pricing by gas stations has shown that where gas stations switch to collusive algorithmic-pricing software such as Kalibrate Fuel Pricing, the mean price increase can be roughly 4 cents per gallon at today's prices, which are already high. However, where a high proportion of an area's stations have adopted the software, gasoline prices may increase as much as 4.5%, or 19 cents per gallon, as explained in paragraph 155. Though Kalibrate keeps much of its customer information confidential, public records reflect that when a California fuel station operated by Albertsons, a major operator of supermarkets and drugstores, adopted Kalibrate Fuel Pricing during a time of lower overall fuel prices, its retail fuel prices quickly increased by 3 to 4 cents per gallon, consistent with this research. Kalibrate likewise has advertised

[22] Matt Stoller, *Yes, Gas Prices Are Being Manipulated by Price Fixing Software*, BIG (June 24, 2026), https://www.thebignewsletter.com/p/how-do-you-beat-an-oligarchy-one (reporting that Kalibrate's website touted "optimization to squeeze out profit").

[23] The Capitol Forum, *Kalibrate: Company's New Location Intelligence Tool Raises Antitrust Concerns*, Vol. 13 No. 1041 (Dec. 19, 2025).

that using Kalibrate Fuel Pricing results in an increase in margins and profits while selling fewer gallons overall—a hallmark of anticompetitive behavior.

### *C. Kalibrate Fuel Pricing Incorporates Data from All of the Competing Gas Stations in a Market, Including Its Customers*

55. To power the collusive common pricing algorithm of Kalibrate Fuel Pricing, Kalibrate has amassed large amounts of both public and nonpublic data to facilitate its customers charging supracompetitive prices. Kalibrate advertises that it "collects raw data from over 6000 sources" and that it has assembled "[v]ast, far-reaching fuel retail data sets." This data ranges from public surveys to proprietary third-party reports, volume data, and surveillance of consumers' cellphone location data.

56. Kalibrate's data assets not only include the data any single retailer supplies but also extend well beyond it. Kalibrate sells a separate Market Intelligence product that advertises site-level competitor prices, volumes, market share, and performance.[24] Kalibrate has claimed that "[o]ver 70% of the data is proprietary to Kalibrate and can't be purchased elsewhere."[25] Kalibrate's U.S. fuel-industry webpage touts that its market survey data gathers more than 100 attributes for each site.[26] Kalibrate has historically urged customers to combine its Pricing, Location, and Market Intelligence offerings, telling them that "[s]uccess comes from synergy," and has described its pricing solution as backed by verified fuel retail market intelligence.[27] As recently as February 2024, Kalibrate's product page for Kalibrate Fuel Pricing promoted artificial intelligence that

---

[24] Kalibrate, *Kalibrate Market Intelligence*, https://kalibrate.com/kalibrate-market-intelligence-software/ (last visited Oct. 16, 2026).

[25] The Capitol Forum, *Kalibrate: Pricing and Analytics Software Potentially Facilitating Collusion in the Fuel Retail Market*, Vol. 13 No. 528 (June 24, 2025).

[26] *Fuel Industry Pricing and Location Intelligence*, *supra* note 13.

[27] Kalibrate, *Kalibrate Cloud*, https://web.archive.org/web/20170907180252/https://www.kalibrate.in/kalibrate-cloud (archived Sept. 7, 2017); Kalibrate, *Pricing Cloud*, https://web.archive.org/web/20170907180311/https://www.kalibrate.in/pricing-cloud (archived Sept. 7, 2017).

combines large amounts of data, infers missing data, applies a proprietary data-enrichment process, and relies on models tested in fuel-retail pricing.[28]

57. In October 2025, Kalibrate announced new Kalibrate Fuel Pricing features that integrate Kalibrate's location intelligence directly into the pricing workflow. Kalibrate's "Local Market Insights" feature identifies shared footfall, important competitors, and customer movement, and Kalibrate stated that its location intelligence methodology underpins the evolution of its pricing intelligence.[29] A Kalibrate employee explained the change: "One of the things we're very proud of this year is introducing customer transience data into our fuel pricing solution. So, we're now starting to have data sets that exist in our other solutions transfer and add value into the solutions that clients are using in different areas of their business."[30]

58. Kalibrate boasts that it offers its customers "[c]omplete visibility on [their] competitors"—including those competitors who also provide their confidential pricing and volume data to Kalibrate Fuel Pricing:




[28] Kalibrate, *Kalibrate Pricing*, https://web.archive.org/web/20240205202618/https://kalibrate.com/products/software/kalibrate-pricing/ (archived Feb. 5, 2024).

[29] Kalibrate, *Insight for Fuel Pricing Strategy: Avoiding the Noise*, Kalibrate (Oct. 29, 2025), https://kalibrate.com/insights/blog/insight-for-fuel-pricing-strategy-avoiding-the-noise/.

[30] The Capitol Forum, *Company's New Location Intelligence Tool*, *supra* note 23.

59. Kalibrate's customers, including the Gas Station Defendants, understand that one of the primary benefits of using Kalibrate Fuel Pricing is access to their competitors' non-public pricing and volume data. As explained in further detail at paragraphs 145 to 147, the unique benefits flowing from the access and use of competitors' data are also corroborated by independent academic research. In fact, Kalibrate includes customer testimonials on its website emphasizing the importance of the unique non-public competitor data Kalibrate possesses, which only its customers are allowed to access. In product demos, Kalibrate also has shown potential customers the confidential, non-public, competitively sensitive information of competing gas stations—including non-public, competitively sensitive fuel sales volumes—that Kalibrate would make available to them.

60. One customer testimonial gushes about how Kalibrate Fuel Pricing has allowed it to better understand how its competitors' decisions affected its own profits: "It's given us tons of visibility into the competitive landscape and how that affects our volume and margin, that we simply didn't have before . . . ."

> *"What mattered most to us is speed and accuracy of competitive pricing. We just couldn't trust the data we were seeing in the other platforms."*

61. A pricing analyst for Defendant Kwik Trip similarly explains how Kalibrate Fuel Pricing allows it to coordinate pricing with its competitors based on the proprietary data Kalibrate provides about those competitors: "[Q:] How does the data and insight in Kalibrate influence your fuel pricing decisions? [A:] The data and insight that we receive, it's brought into one place into Kalibrate, so it's very easy for me to look at and understand a competitor's way of thinking or how they'll react to something, or a move that I made. . . . If someone challenges me on a decision, it's very easy for me to go back and explain how or why I chose that price based on learning competitor

behavior . . . ." In the same client story, Kalibrate touts as a benefit of Kalibrate Fuel Pricing "[v]isibility into how competitors are likely to react to fuel price changes."[31]

62. Kalibrate's customers, including the Gas Station Defendants, also understand that Kalibrate Fuel Pricing will improve their margins only if they provide Kalibrate with their own competitively sensitive inventory, pricing, cost, volume, and market data to be processed in conjunction with their competitors' data.

63. In the retail fuel market, demand elasticity measures how sensitive drivers are to price differences between nearby competing stations, or in other words the number of customers who would switch to a competing gas station in response to a price hike. While gas stations can and do independently adjust their prices, doing so under normal competitive conditions carries an inherent risk. If a station raises its prices too much on its own, drivers will simply divert to a cheaper nearby competitor or will purchase less fuel, rendering the price increase unprofitable.

64. Kalibrate Fuel Pricing makes it significantly easier to execute these price increases and minimize competition between gas stations.

65. Accurately assessing demand elasticity requires analyzing two distinct core inputs: retail prices, which are often public, and the corresponding sales volume data of gas stations in a given area, which is strictly non-public.

66. Using real-time data from local rivals, Kalibrate harnesses sophisticated algorithms to model elasticity between stations in a given area and coordinate price increases in a way that individual gas stations otherwise could not accomplish without illegally conspiring:

> You should be able to relate your prices, and competitor prices, to volume. Employ an elasticity model to strike the balance between not dropping the price too quickly, and not being seen to lag behind. To monitor and manage this level of data, and respond to such rapid market changes, you need to shift away from manual pricing and embrace automation.

[31] Kalibrate, *Kwik Trip Brings Clarity and Confidence to Fuel Pricing Decisions*, https://kalibrate.com/insights/client-stories/kwik-trip-brings-clarity-and-confidence-to-fuel-pricing-decisions/ (last visited Sept. 3, 2026).

67. This mutual reliance on non-public data about competing gas stations provides the Gas Station Defendants with the economic insights and confidence necessary to successfully increase pump prices. Instead of risking a costly drop in volume, the software gives participating stations a higher degree of certainty that they can raise prices across the board while ensuring they do not lose too many sales to neighboring competitors. As stated by the Head of Product Management for Kalibrate Fuel Pricing in a promotional video: "[I]t's really important that you utilize AI with a strong knowledge of both your customers and your competitors."

68. Below is a diagram created by Kalibrate illustrating the combination of public and non-public data that feeds into Kalibrate Fuel Pricing to enable price increases:




**III. The Gas Station Defendants Use Kalibrate Fuel Pricing to Fix Prices**

69. In 2014, Wawa purchased Kalibrate's PriceNet fuel-pricing system, the predecessor of Kalibrate Fuel Pricing, and deployed it across its then-existing network of fuel stations. Kalibrate continued to identify Wawa as a fuel-retail client in May 2021, when a Kalibrate event page described a panel of Kalibrate's "fuel retail clients" that included a Wawa representative.[32]

[32] Kalibrate, Event Page (May 7, 2021), https://app.livestorm.co/kalibrate/the-real-world-lessons-learned-from-our-fuel-and-convenience-customers.

Upon information and belief, Wawa continued to use PriceNet or a successor Kalibrate fuel-pricing product, including Kalibrate Fuel Pricing, during at least part of the Class Period, including at its stations in Vineland, New Jersey and in this District, and supplied Kalibrate with the non-public cost, volume, and margin data that the software requires.

70. Speedway operates more than 2,800 Speedway-branded retail fuel stations in the Class Area. In 2015, Speedway contracted with Kalibrate for perpetual licenses to Kalibrate's retail fuel-pricing software for 2,673 U.S. sites. The contract provided for live, operational pricing and incorporated competitor classifications, a Speedway-specific pricing rule, volume projections, daily and hourly variances, dashboards, and related pricing functions. It provided that termination of Kalibrate's maintenance services would not terminate Speedway's license, and it prohibited Kalibrate from publicly identifying Speedway as a customer.[33] Upon information and belief, Speedway used Kalibrate Fuel Pricing to automate and raise prices at its stations, including its stations in Canton, Ohio and in this District, during at least part of the Class Period, and supplied Kalibrate with its non-public volume and other data to do so.

71. Kwik Trip uses Kalibrate Fuel Pricing to price fuel at its stations. As alleged in paragraph 61, Kalibrate's website features a client story in which a Kwik Trip pricing analyst, responsible for pricing about 130 stores with backup responsibility for 300 more, explains that Kalibrate Fuel Pricing allows him to "understand a competitor's way of thinking or how they'll react to something, or a move that I made."[34] Kwik Trip thus uses Kalibrate Fuel Pricing to anticipate its rivals' reactions and to build them into its own prices.

72. As alleged in paragraph 41, EG America transitioned its entire network of more than 1,600 fuel and convenience outlets to Kalibrate's centralized pricing software, so that its pricing decisions are made automatically. EG America has used Kalibrate Fuel Pricing to automate

---

[33] Countercl. & Exs., *Speedway LLC v. Knowledge Support Sys., Inc.*, No. 2:20-cv-00925 (S.D. Ohio).

[34] *Kwik Trip Brings Clarity and Confidence to Fuel Pricing Decisions*, *supra* note 31.

and raise prices in its stations' markets since at least 2020, including at its Turkey Hill-branded stations in this District.

73. Murphy USA, through the Murphy USA Defendants, operates more than 1,700 retail fuel stations in the Class Area, including 156 QuickChek-branded stores in New Jersey and New York.[35] On Murphy USA's first-quarter 2021 earnings call, in discussing its integration of QuickChek, Murphy USA's chief executive officer told investors that the company was "deploying a commonplace use of the Kalibrate fuels pricing system and how we utilize competitor data sets to develop market-based pricing tactics."[36] Upon information and belief, the Murphy USA Defendants have used Kalibrate Fuel Pricing to set prices at Murphy USA, Murphy Express, and QuickChek stations, including in Canton, Ohio and in New Jersey, during the Class Period.

74. The Gas Station Defendants compete with one another for the same motorists. Wawa and QuickChek both operate numerous stations in New Jersey. Speedway and Murphy Oil USA both operate stations in Canton, Ohio. Speedway and EG America both operate stations in Lancaster County, Pennsylvania, within this District. Each Gas Station Defendant that adopted Kalibrate Fuel Pricing therefore delegated its pricing to the same algorithm that, upon information and belief, priced the stations of rivals competing for the same customers.

### IV. Kalibrate's Agreements with the Gas Station Defendants Constitute an Illegal Hub-and-Spoke Conspiracy in Violation of Section 1 of the Sherman Act

75. At all relevant times, Defendants have entered into and maintained a contract, combination, and/or conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1—a hub-and-spoke conspiracy consisting of vertical agreements between Kalibrate and each Gas Station Defendant and a horizontal agreement among the Gas Station Defendants—for the unlawful purpose of tampering with and controlling the retail price of gasoline throughout the Class Area.

---

[35] Murphy USA Inc., Annual Report (Form 10-K), *supra* note 3.

[36] *Murphy USA Finding Wins in QuickChek Integration*, Convenience Store News (2021), https://csnews.com/murphy-usa-finding-wins-quickchek-integration (quoting Andrew Clyde).

76. First, the Gas Station Defendants have each engaged in concerted activity with Kalibrate in violation of Section 1 of the Sherman Act. Each Gas Station Defendant has combined with Kalibrate so as to replace its independent pricing decision-making with an algorithmic pricing mechanism that coordinates that Gas Station Defendant's pricing decisions with the pricing decisions of its competitors, thereby fixing, tampering, or otherwise interfering with the price of gasoline sold at the Gas Station Defendants' sites throughout the Class Area.

77. As explained in paragraphs 145 to 151, Kalibrate Fuel Pricing only works to achieve margins as advertised if each Gas Station Defendant allows Kalibrate to determine the optimal supracompetitive fuel price and adopts that price with little or no second guessing.

78. Kalibrate's advertising makes clear that a key value proposition of Kalibrate Fuel Pricing is its use of competitor information to maximize prices in each market by avoiding unnecessary downward price competition. Kalibrate's customers understand that in exchange for surrendering their commercially sensitive pricing, cost, and volume data to Kalibrate, and delegating their pricing decisions to Kalibrate Fuel Pricing, Kalibrate's algorithm will coordinate with other nearby gas stations to increase their profits by eliminating normal price-cutting competition which would otherwise benefit consumers. Put simply, these Kalibrate customers can safely push prices to supracompetitive levels without risking the customer loss that would otherwise make such hikes unprofitable.

79. By adopting the price recommendations generated by Kalibrate Fuel Pricing, the Gas Station Defendants have surrendered their independent pricing authority to a third party's automated common pricing algorithm designed to maximize the price of gasoline within a market, and to impede the free interplay of competition and supply and demand among gas stations. The Gas Station Defendants' contracts with Kalibrate were entered into with the specific knowledge and expectation that Kalibrate Fuel Pricing would direct the Gas Station Defendants' own pricing systems to avoid competition. Each Gas Station Defendant purposely abdicated its independent duty to compete by entering into a trust aimed at maintaining supracompetitive prices.

80. Further, by utilizing Kalibrate Fuel Pricing to achieve and maintain supracompetitive pricing that no station would risk setting independently, the Gas Station Defendants have also combined among themselves as well as with Kalibrate to artificially inflate the price of gasoline for consumers throughout the Class Area.

### V. Anticompetitive Price Fixing, Including Defendants' Use and Distribution of Kalibrate Fuel Pricing, Is *Per Se* Illegal Under Section 1 of the Sherman Act

81. Price fixing of any stripe is *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

82. The quintessential image of price fixing is a secret deal made between competitors over cigars in a smoky back room. But as technology has advanced, so too have the mechanisms available to competitors to fix prices without the cigars, the smoke, or even the room. Common pricing algorithms allow competitors to pool confidential data and generate prices based on those data without communicating with each other directly.

83. Federal antitrust law makes clear that competitors cannot evade liability for fixing prices simply by delegating their pricing decisions to a common algorithm rather than communicating directly with one another. Courts and enforcers applying Section 1 of the Sherman Act have long treated the use of an intermediary—whether a human agent or, more recently, a pricing algorithm—to collect and redistribute competitors' confidential pricing information as the same hub-and-spoke conspiracy the antitrust laws have always prohibited. The mechanism competitors use to fix prices, whether a phone call, a trade association, or a software algorithm, is immaterial to whether Section 1 has been violated.

84. This is not a novel legal theory. Federal courts and enforcement agencies have repeatedly recognized that applying Section 1 of the Sherman Act to algorithmic price-fixing is simply an application of longstanding hub-and-spoke conspiracy doctrine to a new technological tool, not the creation of new law. Competitors who use a common pricing algorithm to coordinate prices are just as liable under Section 1 as competitors who fix prices through direct communication.

85. Kalibrate Fuel Pricing qualifies as the kind of common pricing algorithm that gives rise to an unlawful hub-and-spoke conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1. Kalibrate Fuel Pricing is software used by two or more persons that uses competitor data to recommend, align, stabilize, set, and influence gasoline prices.

86. The understanding and agreement among the Gas Station Defendants and Kalibrate to use Kalibrate Fuel Pricing to raise gasoline prices, and charge more to consumers, is *per se* illegal under Section 1 of the Sherman Act.

87. Because the conduct alleged herein increases prices and reduces output, if the Court declines to analyze this case under the *per se* rule, the Court could conduct a quick look review. For both standards, Plaintiffs are not required to define a relevant antitrust market or to prove that Gas Station Defendants had market power in any defined antitrust market.

## VI. Relevant Markets

88. To the extent the Court nonetheless decides to engage in a rule of reason analysis, and a relevant market analysis is required, the relevant product market is the retail sale of gasoline. The relevant geographic markets are the local areas of effective competition surrounding each of the Gas Station Defendants' stations in the Class Area, as described below. Plaintiffs carry their initial burden under the rule of reason through direct evidence of anticompetitive effects—higher prices and margins accompanied by reduced output—and, in the alternative, through Defendants' market power in the relevant markets. The local geographic markets are pleaded to measure the effects of Defendants' conduct; the Classes are defined by Defendants' nationwide restraint.

### *A. Product Market*

89. Consumers need to purchase gasoline to power and use their gasoline-powered vehicles. Consumers can purchase this gasoline only at retail gas stations. Consumers cannot feasibly purchase or store gasoline in wholesale quantities. Consumers cannot use other types of fuel, such as diesel, in their gasoline-powered vehicles. Consumers with gasoline-powered vehicles cannot feasibly switch to other means of transportation in response to a small but significant price increase in the retail sale of gasoline. For example, the switching costs involved

in replacing a gasoline-powered vehicle with an electric vehicle are significant. This type of switching is an expensive and time-consuming undertaking which requires a large up-front investment or financing. Public transit, on the other hand, is typically much slower and less reliable than driving in one's own vehicle and serves only limited routes at limited time periods throughout the day. Public transit therefore is not a comparable substitute for the vast majority of consumers. As explained by the Bureau of Labor Statistics in a publication using gasoline to explain the concept of inelastic demand, gasoline "is a necessity for many daily functions and reducing consumption is difficult even when the good becomes increasingly costly. Gasoline is difficult to substitute and necessary to many citizens for daily life."[37] For consumers with gasoline-powered vehicles, no economic or practical alternative to the retail sale of gasoline exists in the event of a small but significant price increase.

90. Market participants such as fuel wholesalers, gas station operators, and the general public recognize gasoline sold at retail as a distinct product and market.

91. Federal antitrust enforcers likewise recognize the retail sale of gasoline as a relevant product market. In 2021, when 7-Eleven, Inc. acquired Speedway's retail fuel business, the Federal Trade Commission ("FTC") alleged that "the retail sale of gasoline" is a relevant product market in which to analyze the effects of the acquisition.[38]

92. The market for the retail sale of gasoline is characterized by specialized vendors and unique facilities that are not interchangeable with other business types. The specialized infrastructure—including underground storage tanks, high-flow pumping hardware, and specific environmental safety systems—is unique to the retail fuel industry and carefully regulated by federal and state regulators. Because these facilities cannot be easily converted to other uses, and

---

[37] Eliana Eitches & Vera Crain, U.S. Bureau of Labor Statistics, *Using Gasoline Data to Explain Inelasticity*, 5 Beyond the Numbers: Prices and Spending, at 5 (Mar. 2016), https://www.bls.gov/opub/btn/volume-5/pdf/using-gasoline-data-to-explain-inelasticity.pdf.

[38] Complaint ¶¶ 13–15, *In re Seven & i Holdings Co.*, FTC Docket No. C-4748 (June 25, 2021), https://www.ftc.gov/system/files/documents/cases/2010108c4748isevenmarathoncomplaint.pdf.

because general retailers cannot easily install such equipment, the retail sale of gasoline constitutes a distinct area of effective competition.

93. Additionally, gasoline possesses peculiar characteristics and uses that distinguish it from any other commodity. Gasoline is refined and chemically formulated specifically for use in internal combustion engines. This uniqueness is reflected in the distinct prices and the lack of cross-price elasticity between gasoline and other consumer goods, including other retailed oil byproducts.

94. The price of gasoline at the pump is tracked and reacted to by consumers as a standalone economic factor, independent of the pricing of other retail products like jet fuel, heating oil, or diesel. Because there is no functional substitute for the specific energy density and combustible properties of gasoline for gasoline-powered vehicles, the market exhibits the sensitivity to price changes typical of a market where consumers are unable to turn to alternative products in response to a price increase.

95. The market for the retail sale of gasoline also satisfies the test for market definition used by economists and federal antitrust enforcement agencies known as the hypothetical monopolist test. This test examines whether a hypothetical monopolist of a proposed relevant market could profitably impose a small but significant non-transitory increase in price on a product within the relevant market without causing enough customers to turn to more distant products outside the proposed relevant market and render the increase unprofitable. Here, the hypothetical monopolist test is satisfied because a monopolist in the retail sale of gasoline would not lose enough sales as the result of a small but significant non-transitory increase in price of the product to make the price increase unprofitable. The retail sale of gasoline therefore constitutes a properly defined relevant market.

***B. Geographic Markets***

96. As discussed in paragraph 87, Plaintiffs are not required to prove that Gas Station Defendants have market power in any defined antitrust market to state a claim under Section 1 of the Sherman Act. Nonetheless, if required to do so, it is evident that consumers prefer to buy

gasoline at gas stations near where they live or work, or along preplanned routes. Competition for the sale of gasoline is therefore local. Consumers do not consider distant gas stations as substitutes for their local gas stations. For one thing, the fuel costs associated with driving to a distant station will quickly erase any marginal savings from buying cheaper gasoline.

97. Kalibrate and the Gas Station Defendants operate across the Class Area. The Gas Station Defendants sell gasoline throughout the Class Area, and Kalibrate coordinates their pricing across that territory. However, given the localized nature of competition for the retail sale of gasoline, the local markets surrounding the Gas Station Defendants' stations within the Class Area are the relevant geographic markets in which to evaluate the effects of Defendants' conduct. A hypothetical monopolist of any of these local markets could profitably impose a small but significant non-transitory increase in price at one retail outlet within a given local relevant geographic market without causing enough consumers to turn to gas stations outside of that proposed market to render the price increase unprofitable.

98. Each local geographic market consists of the area within which motorists who buy fuel at a given station can practicably turn to other stations: the stations along the routes those motorists travel between home, work, and other regular destinations. Motorists generally will not leave those routes or drive across town to save a few cents per gallon, because the time and fuel consumed by the trip would erase the savings. Prices vary from station to station within each local market, and stations set their prices by reference to nearby rivals rather than distant ones.

99. Participants in the industry recognize these local markets. In reviewing 7-Eleven, Inc.'s acquisition of Speedway's retail fuel business, the FTC alleged that the relevant geographic markets for retail gasoline are "highly localized," that "[e]ach relevant market is distinct and reflects the commuting patterns, traffic flows, and outlet characteristics unique to each market," and that "[c]onsumers typically choose between nearby retail fuel outlets with similar characteristics along their planned routes."[39] Kalibrate likewise states that its pricing

[39] *Id.*

recommendations are "based entirely on your own micro-market evaluations."[40] And according to a former Kalibrate employee, a Kalibrate Fuel Pricing customer pricing a station might identify fifteen competitors within one mile, and three of those to watch and react to.[41]

### *C. Representative Local Markets*

100. The local markets in which Plaintiffs bought fuel, along with a central New Jersey market in which Wawa and QuickChek compete at the same intersection, illustrate these markets and the effects of Defendants' conduct in them.

101. ***Vineland, New Jersey***. Vineland is a city in Cumberland County, in southern New Jersey, where Ms. Willis lives and buys fuel. Residents of Vineland buy fuel at stations along the city's principal commercial corridors, including Landis Avenue, Delsea Drive, and Main Road, rather than traveling to other communities. Wawa operates at least five stations in Vineland, including a station with sixteen fuel pumps at 1935 West Landis Avenue that opened in June 2022.[42] Wawa's Vineland stations compete with one another and with other stations along the same corridors. Upon information and belief, Kalibrate Fuel Pricing has set or recommended the prices at Wawa's Vineland stations during at least part of the Class Period.

102. ***Canton, Ohio***. Canton is a city in Stark County, in northeastern Ohio, where Mr. Simonich lives and buys fuel. Speedway operates at least twelve stations in Canton, including stations on Navarre Road, Faircrest Street, Southway Street, Cleveland Avenue, Tuscarawas Street, Fulton Drive, Mahoning Road, Lincoln Street, Everhard Road, Hills and Dales Road, and Middlebranch Avenue. Murphy Oil USA, upon information and belief, operates the Murphy USA stations at 3220 Atlantic Boulevard NE and 4030 Tuscarawas Street W in Canton. Speedway also operates a station at 3131 Tuscarawas Street W. Speedway's and Murphy USA's Canton stations compete with one another and with other stations in the city. Upon information and belief,

---

[40] *Kalibrate Fuel Pricing Software*, *supra* note 6.

[41] The Capitol Forum, *Pricing and Analytics Software*, *supra* note 25.

[42] *Coffee and Confetti, Wawa Celebrates Opening of West Landis Store*, Yahoo News (June 24, 2022), https://www.yahoo.com/news/coffee-confetti-wawa-celebrates-opening-145011371.html.

Kalibrate Fuel Pricing has set or recommended the prices at Speedway's and Murphy USA's Canton stations during at least part of the Class Period.

103. ***Monroe Township, New Jersey***. Monroe Township is in Middlesex County, in central New Jersey, where Wawa and QuickChek compete head to head. In August 2017, QuickChek opened a station at the intersection of Route 33 and Applegarth Road, across the highway from a Wawa station that had opened in late 2014.[43] The two stations compete for the same motorists traveling Route 33. Upon information and belief, Kalibrate Fuel Pricing has set or recommended the prices at both stations during at least part of the Class Period.

104. In each of these markets, and in the other local markets in which the Gas Station Defendants' stations compete, Defendants' conduct has had actual detrimental effects on competition. Kalibrate's own published materials show the effect: in one client story, Kalibrate reported that a site-by-site strategy that "increased fuel price in some areas, and decreased fuel prices in others" "[w]ould result in a volume decrease of -2.2%, and a total profit increase of $587 per site per week."[44] Margins rising while volumes fall is the signature of a restraint that raises prices and reduces output. The academic literature on algorithmic fuel pricing, described below, confirms that margins rise where competing stations adopt the same pricing software.

105. In the alternative, Defendants possess market power in the relevant markets. Demand for retail gasoline is inelastic; barriers to entry are high; and Kalibrate Fuel Pricing reaches a substantial share of the stations in the markets where it is used, as Kalibrate's claim that "15 of the top 20 fuel retailers in the US use Kalibrate" reflects. Where multiple stations in a local market delegate their prices to Kalibrate Fuel Pricing, those stations can raise prices without losing enough sales to make the increase unprofitable.

---

[43] Carly Baldwin, *Rt. 33 QuickChek Opens in Monroe*, Patch (Aug. 30, 2017), https://patch.com/new-jersey/woodbridge/check-out-fancy-new-quickchek-opened-rt-33; Dino Flammia, *QuickChek and Wawa, CVS and Walgreens … Why Are Competitors So Close in NJ?*, N.J. 101.5 (Apr. 11, 2017), https://nj1015.com/quickchek-and-wawa-cvs-and-walgreens-why-are-competitors-so-close-in-nj/.

[44] Kalibrate, *How Fuel Pricing Drives In-Store Profitability* 7 (Jan. 2026) (eBook), https://fuelpricing.kalibrate.com/insights/downloads/how-fuel-pricing-drives-in-store-profitability.

## VII. Several Plus Factors Reinforce the Existence of a Combination in Restraint of Trade Among the Gas Station Defendants

### *A. High Barriers to Entry*

106. Significant barriers exist for businesses seeking to enter and compete in the market for the retail sale of gasoline. These barriers include the sparse availability of attractive real estate, as well as the time and cost associated with building a new gas station and obtaining the necessary permits and approvals. Building a new gas station can cost several million dollars. Site selection, permitting, design, and construction can take years.

107. And as detailed in paragraphs 95, 97, and 106, a new entrant is unlikely to offset price increases in the retail sale of gasoline caused by Defendants' anticompetitive conduct.

### *B. Fungible Product Subject to Inelastic Demand*

108. Gasoline is a fungible commodity. The product characteristics of gasoline are largely uniform, and without lab testing it is not possible to differentiate gasoline manufactured, sold, or distributed by a given entity. Though certain gasoline brands may seek to differentiate themselves through branding, gasoline is refined, sold, transported, and blended in large quantities. A gasoline-powered vehicle can readily use the gasoline of any gasoline brand and, with very limited exceptions such as high-performance sports cars, every type of gasoline. Though certain additives may be mixed with gasoline to satisfy engine specifications or emissions standards, these additives are standardized across suppliers in pertinent markets and do not affect the fungible nature of gasoline.

109. Demand for the retail sale of gasoline is inelastic. Most people in the United States use gasoline-powered automobiles as their primary form of transportation. As explained by the Bureau of Labor Statistics in a publication using gasoline to explain the concept of inelastic demand, gasoline "is a necessity for many daily functions and reducing consumption is difficult even when the good becomes increasingly costly. Gasoline is difficult to substitute and necessary to many citizens for daily life."

### *C. Motive, Opportunity, and Invitation to Collude*

110. Kalibrate's own marketing materials explain the company's and the Gas Station Defendants' motive and opportunity to collude, and Kalibrate invites potential customers, including the Gas Station Defendants, to use Kalibrate Fuel Pricing to implement this collusion. Kalibrate also provides its fuel-pricing clients with opportunities to meet with one another. In May 2026, Kalibrate reported that it had "brought together a group of fuel pricing and operations leaders in Chicago for a focused, in-person client meetup," at which "[a]ttendees actively shared experiences, challenged ideas, and explored how others are approaching similar pressures," and that the meetup "reinforced the importance of bringing peers together."[45]

111. In its marketing materials, Kalibrate explains to gas station operators that they can use Kalibrate Fuel Pricing to increase their margins by coordinating to avoid price wars with their competitors. Kalibrate warns potential customers that if they do not use Kalibrate Fuel Pricing to avoid price cutting competition with their competitors, they may be needlessly "sacrificing margin in an attempt to draw volume." Even worse, Kalibrate warns that potential customers who choose to compete on price "could be making a change that triggers a downward spiral and has negative implications for everyone operating in that market." Kalibrate tells potential customers: "Your competitors look to you to set the prices and will just modify their prices accordingly."

112. Kalibrate offers Kalibrate Fuel Pricing as a solution, a tool that enables its customers to stop needlessly competing with one another on price and to instead work cooperatively to keep their prices high to "squeeze out profit" from consumers. Kalibrate even builds the avoidance of price wars into the rules that its algorithm applies.

113. In sum, Kalibrate warns gas station operators that they will lose money and margin by competing with other market participants, and markets Kalibrate Fuel Pricing as a method to collude to avoid price cutting and even raise prices. This constitutes a clear invitation to collude,

---

[45] Kalibrate, *Bringing Fuel Pricing Leaders Together: Highlights from Our Chicago Meetup* (May 19, 2026), https://kalibrate.com/insights/blog/bringing-fuel-pricing-leaders-together-highlights-from-our-chicago-meetup/.

and this collusion to avoid price competition is central to delivering Kalibrate Fuel Pricing's value proposition.

114. Kalibrate's Fuel Pricing customers—including the Gas Station Defendants—understand that by contracting with Kalibrate, they are purchasing access to a system that will provide them with full visibility into their competitors' pricing and sales, allow them to stop competing vigorously on price with their competitors, and even assure them that they need not fear a price war with rivals that use the same software. These competition-eliminating features are the core value proposition of Kalibrate Fuel Pricing. Absent these collusive outcomes, it would make no sense to pay what Kalibrate charges for Kalibrate Fuel Pricing, since Kalibrate itself has acknowledged that using Kalibrate Fuel Pricing merely to automate pricing will not achieve meaningful margin increases offered by the software. Kalibrate's Fuel Pricing customers—including the Gas Station Defendants—accept Kalibrate's invitation to collude when they sign on to delegate their pricing decisions to Kalibrate Fuel Pricing so that Kalibrate can raise their prices and their competitors' prices together.

### *D. Actions Against Self-Interest Explained Only by the Existence of a Trust*

115. The Gas Station Defendants each have acted in ways that would be against their independent economic self-interest in the absence of collusion. Simply put, no Gas Station Defendant would hand over the keys for their pricing, inventories, volumes, and sales to a third party like Kalibrate who promises to compete less intensely with other area gas stations unless it knew that same third party was also promising that the gas station's competitors would not undercut it. This is the essence of an action against self-interest in which Defendants would not engage in the absence of an unlawful trust.

116. The Gas Station Defendants similarly provide their confidential, competitively sensitive information for ingestion into Kalibrate's Pricing Cloud. Kalibrate publicizes that it uses its vast array of competitor data to power Kalibrate Fuel Pricing's algorithms. The Gas Station Defendants would not provide their confidential information to a pricing company such as Kalibrate that also powers pricing decisions for competing gas stations in the absence of collusion.

But the Gas Station Defendants understand that through Kalibrate Fuel Pricing, their confidential information will be used in conjunction with the confidential information of competitors to facilitate market-wide price increases and the end of true price competition.

### *1. Maintaining Elevated Prices*

117. In a competitive, well-functioning market, the Gas Station Defendants would reduce the retail price of their fuel down toward their costs to attract consumers from their competitors' gas stations and win market share. Kalibrate itself acknowledges this 'natural' state of competition in its marketing materials: "[I]f you decide to drop your prices in an effort to drive high volume over a short space of time, you might enjoy a momentary uplift while the rest of the market catches up . . . ."

118. In a competitive market, it would be against each Gas Station Defendant's self-interest to keep their prices high and refrain from vigorous price competition with other gas stations, because they would lose customers to price-cutting competitors.

119. However, Kalibrate tells its customers that they can keep prices high by colluding. In an affidavit filed in the Federal Court of Canada in the Competition Bureau of Canada's ongoing investigation of Kalibrate, the Bureau's Senior Competition Law Officer averred: "Kalibrate markets its pricing services as a way for gas stations to increase their margins and avoid price wars." Kalibrate tells its customers not to cut prices as would be in their independent economic self-interest, because through concerted action they can earn higher profits.

120. Kalibrate's approach to retail gasoline pricing makes sense only as part of an illegal agreement to restrain price competition.

121. Joining in the collusion among users of Kalibrate Fuel Pricing is key to the service's main value proposition. Kalibrate's marketing materials make clear Kalibrate Fuel Pricing enables customers to delegate their pricing decisions to Kalibrate's algorithm, coordinate higher prices with other gas stations in their markets, and deprioritize chasing volume through lower prices in favor of colluding to charge consumers more for gasoline at the pump.

122. When Kalibrate's customers, including the Gas Station Defendants, sign up to use Kalibrate Fuel Pricing, they understand that they are joining a system that uses a common pricing algorithm to coordinate price increases with their competitors in the market. This collusion is not merely a niche feature of Kalibrate Fuel Pricing; collusion is its main purpose and value proposition. Kalibrate acts as a single pricing decision-maker for its customers, including the Gas Station Defendants. The Gas Station Defendants understand that ceding their pricing to Kalibrate and allowing Kalibrate Fuel Pricing to reduce price competition with competing stations is key to achieving the margin gains Kalibrate advertises.

123. One Kalibrate executive confirmed in an interview that if a gas station merely uses Kalibrate Fuel Pricing to streamline its pricing operations, the station will not see the full return on investment offered by the pricing algorithm: "Starting to use smart analytics and optimization is where you really make the big bucks. Now, if all you're interested in is the operational efficiencies, in other words, getting prices from the point of decision to the pump, POS and price sign, then the [return on investment] might take a little longer . . . ." But, when gas stations surrender their prices to Kalibrate Fuel Pricing and its competitor-led fuel pricing decisions, they can exploit their "pricing power" such that the increases in their margins will pay for the three-year subscription well within the first year of using the software—sometimes even within the first two months.

124. By delegating all or the vast majority of their pricing decisions to Kalibrate, the Gas Station Defendants use Kalibrate Fuel Pricing as the tool to maintain high prices that would drive customers away and would be against their independent economic self-interests in a competitive market. Their use of Kalibrate Fuel Pricing to maintain high prices makes sense only if other area competitors—including the Gas Station Defendants—collude together to keep prices high by declining to compete.

### *2. Exchange of Competitively Sensitive Information*

125. Kalibrate Fuel Pricing requires customers to provide it with their sensitive, non-public information. For example, the Gas Station Defendants provide Kalibrate not only their

confidential historical gasoline sale costs and volumes, but also their commercially sensitive and non-public forward-looking planned and forecasted costs and volumes.

126. The Gas Station Defendants similarly share with Kalibrate their confidential, commercially sensitive past and planned margins.

127. Kalibrate's documentation makes clear that each customer's data is fed into its central, multi-tenant Pricing Cloud:




128. Once ingested into the Pricing Cloud, Kalibrate uses its customers' confidential historical and forward-looking data, in combination with additional vast proprietary and commercial datasets, to automatically set retail gasoline prices at the Gas Station Defendants' stations.

129. Kalibrate has at times stated in response to inquiries that Kalibrate Fuel Pricing for each customer is "exclusively based on data entered by that individual customer."[46] However, these statements are flatly contradicted by Kalibrate's own promotional materials. Elsewhere, Kalibrate

[46] Letter from Counsel for Kalibrate to Competition Bureau (June 28, 2024), *reprinted in* Application Record, *supra* note 21, at 285.

boasts that it "collects raw data from over 6000 sources" and that it has assembled "[v]ast, far-reaching fuel retail data sets" to power its algorithms. In advertising that Kalibrate Fuel Pricing enables its customers to make "competitor-led fuel pricing decisions," Kalibrate offers gas stations "complete visibility on your competitors." Kalibrate's website includes testimonials from customers raving about how the information Kalibrate provides about competing gas stations allows its customers to maximize their own profits. In product demos, Kalibrate also has shown potential customers the confidential, non-public, competitively sensitive information of competing gas stations—including non-public, competitively sensitive fuel sales volumes—that Kalibrate would make available to them.

130. Kalibrate's own contract terms did not confine its use of customer data to that customer's own pricing. Kalibrate's publicly posted July 2023 Subscription and Services Standard Terms permitted Kalibrate to use data from its subscription service "in aggregated form for security and operations management," to compile statistical analyses, and for research and development, subject only to the condition that Kalibrate's published analyses not identify a customer, an individual, or confidential information.[47]

131. Kalibrate's categorical public assurances that customer data are segregated emerged only after regulators began investigating Kalibrate. The chronology is as follows.

132. Before February 16, 2024, when the Competition Bureau of Canada commenced its inquiry into Kalibrate, Plaintiffs are aware of no public statement by Kalibrate representing that one customer's data does not inform another customer's price recommendations, that Kalibrate's models are trained exclusively on each customer's own data, or that competing customers share no data or models.[48] Kalibrate's product page for Kalibrate Fuel Pricing as of February 5, 2024, contained no such assurance.[49]

---

[47] Kalibrate, Subscription and Services Standard Terms v1.2 § 4.12 (July 2023), https://kalibrate.com/wp-content/uploads/2023/07/Kalibrate_Subscription-and-Services_Standard-Terms_v1.2-1.pdf; *see also id.* §§ 4.9, 8.1, 10.1.

[48] Jokic Aff. ¶¶ 6, 24–27, *supra* note 21.

[49] *Kalibrate Pricing*, *supra* note 28.

133. On June 28, 2024, after the Competition Bureau informed Kalibrate of its inquiry and of its intent to seek a court order compelling Kalibrate to produce records, Kalibrate's counsel wrote to the Bureau representing that Kalibrate Fuel Pricing receives no Kalibrate-supplied inputs.[50] On July 24, 2024, the Bureau obtained an order from the Federal Court of Canada requiring Kalibrate to produce records and written information.[51]

134. Upon information and belief, Kalibrate first stated publicly that each client operates with its own pricing models and rules in a March 17, 2025 article.[52] In June 2025, in response to questions from The Capitol Forum, a Kalibrate spokesperson stated: "Our customers have separate instances of our software which they use to manage their proprietary data."[53] In December 2025, a Kalibrate spokesperson told The Capitol Forum: "We don't share data between customers."[54]

135. In or about January 2026, Kalibrate's website for the first time carried categorical assurances of strict data segregation, no influence from other customers' data, customer-exclusive model training, no shared models, and "no interaction between competitors," alongside a standalone statement that Kalibrate said was issued in light of "recent industry discussions."[55] Kalibrate's product page now states that "[a]ny data you load into Kalibrate Pricing is kept strictly segregated and used solely for your benefit" and that "[y]our data is never shared with other Kalibrate customers."[56]

---

[50] Letter from Counsel for Kalibrate to Competition Bureau (June 28, 2024), *reprinted in* Application Record, *supra* note 21, at 284–89.

[51] The Capitol Forum, *Pricing and Analytics Software*, *supra* note 25.

[52] Kalibrate, *Fuel Pricing AI—One Size Doesn't Fit All*, Kalibrate (Mar. 17, 2025), https://kalibrate.com/insights/blog/fuel-pricing-ai-one-size-doesnt-fit-all/.

[53] The Capitol Forum, *Pricing and Analytics Software*, *supra* note 25.

[54] The Capitol Forum, *Company's New Location Intelligence Tool*, *supra* note 23.

[55] Kalibrate, *Kalibrate Pricing*, https://web.archive.org/web/20251206221745/https://kalibrate.com/products/software/kalibrate-pricing/ (archived Dec. 6, 2025); Kalibrate, *Kalibrate Fuel Pricing Software*, https://web.archive.org/web/20260114143039/https://kalibrate.com/kalibrate-fuel-pricing-software/ (archived Jan. 14, 2026); Kalibrate, *Data Usage and Pricing Independence in Kalibrate Pricing* (Jan. 14, 2026), https://kalibrate.com/data-usage-and-pricing-independence-in-kalibrate-pricing/.

[56] *Kalibrate Fuel Pricing Software*, *supra* note 6.

136. These after-the-fact assurances cannot be reconciled with Kalibrate's earlier marketing of "[c]omplete visibility on [customers'] competitors," its contract terms permitting aggregated use of customer data, and its integration of Kalibrate-supplied data into Kalibrate Fuel Pricing. They served to conceal from the public the nature of the service Kalibrate provided to competing fuel retailers.

137. The Competition Bureau's Senior Competition Law Officer also stated under oath: "[T]he Commissioner has reason to believe that Kalibrate collects competitively sensitive information related to price, cost and output from motor fuel retailers (competitors commonly referred to as 'gas stations')" and uses this data to "produce[] pricing guidance for them."

138. Absent collusion, it would make no sense and would be against each Gas Station Defendant's self-interest to provide non-public, commercially sensitive price, volume, margin, and other data to a software company that also sets prices for its competitors, particularly where that software company itself acknowledges that the benefit of the software is limited if it is used only to streamline fuel pricing. However, because Kalibrate Fuel Pricing uses this data to help its customers coordinate to avoid competing on price, the benefits of being able to collude to charge higher prices outweigh the risk to the Gas Station Defendants of sharing this competitively sensitive information with one's closest competitors.

### *E. Kalibrate Fuel Pricing Is the Subject of Government Investigation*

139. The use of Kalibrate Fuel Pricing as a tool to fix prices is also the subject of an ongoing government investigation. The Competition Bureau of Canada, acting for the Commissioner of Competition, commenced an inquiry into Kalibrate on February 16, 2024. In an affidavit supporting the Bureau's application for a court order compelling Kalibrate to produce records, the Bureau's Senior Competition Law Officer averred: "[T]he Commissioner has reason to believe that . . . Kalibrate[] guides retail motor fuel prices . . . and that this conduct has had, is having or is likely to have the effect of preventing or lessening competition . . . . Further, the Commissioner has reason to believe that Kalibrate collects competitively sensitive information related to price, cost and output from [gas stations], produces pricing guidance for them using

artificial intelligence, machine learning, algorithms, and bespoke consulting services such that competition is likely substantially prevented or lessened . . . ."

### VIII. Defendants' Use of Kalibrate Fuel Pricing Has Increased Gasoline Prices in Local Markets Across the Class Area

140. Kalibrate Fuel Pricing has had its intended purpose of restraining competition and allowing the Gas Station Defendants to raise prices. By stifling the price-cutting retail competition that previously characterized local gasoline markets, Defendants eliminated the competitive dynamic that historically drove local retail prices down.

141. A growing body of literature reflects that when retailers delegate their pricing to algorithmic pricing tools like Kalibrate Fuel Pricing, market prices trend higher, toward monopoly prices.[57] Research has shown that where multiple gas stations in a market use common pricing algorithms, price undercutting among competitors evaporates, gas station margins expand, and market-wide fuel prices can increase as much as 19 cents per gallon of gasoline.

142. The assertion that algorithmic pricing fundamentally alters market competition is not merely a theoretical concern; it is an empirically documented reality. In the seminal study on the topic, Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market ("German Study"), researchers provided the first large-scale analysis of how this technology impacts fuel margins.[58]

143. By examining a high-frequency database of retail gas stations in Germany, the study found that the adoption of algorithmic pricing software leads to a significant and measurable increase in retail prices and margins at stations using algorithmic pricing tools. Because adoption dates are not publicly observed, the researchers identified adopting stations by testing for structural breaks in pricing behavior associated with algorithmic pricing.

---

[57] *See, e.g.*, Leon Musolff, *Algorithmic Pricing, Price Wars and Tacit Collusion: Evidence from E-Commerce* 27 (Dec. 16, 2025), https://lmusolff.com/papers/Algorithmic_Pricing.pdf.

[58] Stephanie Assad, et al., *Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market*, 132 J. Pol. Econ. 723 (2024).

144. Specifically, the study found that after adoption, "mean station-level prices and margins increase by approximately 1.3 cents per litre, or roughly 15% for margins," and that "[a]doption increases margins but only for nonmonopoly stations."[59] This real-world evidence confirms that when fuel retailers outsource their pricing to common pricing algorithms, the primary result is a systematic transfer of wealth from consumers to gas station owners.

145. The study's most alarming findings relate to how these algorithms affect competition. The researchers discovered that the impact on margins of adopting such algorithms is directly tied to the intensity of competition that existed in the market *before* the use of the algorithms. While pre-existing monopolists saw no significant change in their margins, stations that historically faced competition from rivals saw a pronounced increase in margins. Most notably, in markets where stations adopting algorithmic pricing software competed head-to-head, "margins increase only if all stations adopt," and markets in which all stations adopted saw "a margin increase of 3.2 cpl, or roughly 38%."[60]

146. This observation demonstrates that the strong appeal and key value proposition of Kalibrate Fuel Pricing's algorithm lies in its ability to neutralize preexisting retail competition by ensuring that no rival has an incentive to lower prices.

147. Using the algorithms, the gas stations were able to coordinate and signal high prices in ways that humans are unable to do without communications that would violate anti-cartel statutes.

148. The German Study's conclusions are consistent with Kalibrate's public statements and the success of the Gas Station Defendants in increasing their margins. Where preexisting monopolists were already extracting monopoly profits before switching to algorithmic pricing tools, the study did not find an appreciable increase in margins. For these monopolists, the algorithmic pricing tools functioned only to streamline operations. In an interview, a Kalibrate

[59] Assad et al., 132 J. Pol. Econ. at 723; Stephanie Assad et al., *Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market* 4 (June 7, 2023) (author manuscript), https://discovery.ucl.ac.uk/id/eprint/10187765/1/draft_v15_JPE_main.pdf.

[60] Assad et al., 132 J. Pol. Econ. at 723; Assad et al., author manuscript, at 5.

executive similarly noted that using Kalibrate Fuel Pricing merely to streamline a gas station's pricing will not achieve the potential margin gains from the software.

149. Rather, like the algorithmic pricing software in the German Study that juiced up gas station profits by eliminating competition, the core value proposition of Kalibrate Fuel Pricing lies in its ability to eliminate competition in formerly competitive markets.

150. In that same interview, the Kalibrate executive explained that Kalibrate is most effective in growing profits when it helps its customers to leverage their "pricing power." As described at section II.B *supra*, Kalibrate Fuel Pricing enables its customers to exercise their pricing power by collectively deciding not to compete on price.

151. On its website, Kalibrate provides customer testimonials about how it has succeeded in this mission: "We have experienced an improvement in margins since implementing Kalibrate Fuel Pricing."

152. Kalibrate even advertises that Kalibrate Fuel Pricing will increase margins and total profits for its users by raising prices while selling fewer gallons overall. In one eBook, Kalibrate offers an example of how following its anticompetitive fuel strategy "[w]ould result in a volume decrease of -2.2%, and a **total profit increase of $587 per site per week**" (emphasis in original).[61] Increasing price while reducing volume is stark evidence of the anticompetitive effect of Kalibrate Fuel Pricing.

153. Though Kalibrate and the Gas Station Defendants are understandably secretive about the full extent of the price hikes they have been able to achieve on retail gasoline sales using Kalibrate Fuel Pricing, Kalibrate's marketing materials and certain public materials make clear that Defendants have in fact succeeded in using Kalibrate to raise fuel prices and margins to supracompetitive levels.

154. For example, publicly available materials reflect that Albertsons's gasoline prices increased significantly—in one California market, increasing quickly by 3 to 4 cents per gallon—after implementing Kalibrate Fuel Pricing.

---

[61] *How Fuel Pricing Drives In-Store Profitability*, *supra* note 44, at 7.

155. Based on an understanding of the effects of algorithmic retail fuel pricing as illustrated through the German Study, the mean overcharge for gasoline for the Gas Station Defendants' stations using Kalibrate Fuel Pricing is roughly 4 cents per gallon. The price increase is much more pronounced in areas where a high proportion of gas stations have adopted Kalibrate Fuel Pricing, as high as 19 cents per gallon of gasoline. These figures apply the German Study's estimates to current U.S. retail prices. The study found that adoption raised prices at adopting stations by about 1.2 cents per litre, or about 0.9% of the average non-adopter price of €1.361 per litre, and raised mean market prices by about 6 cents per litre, or about 4.5% of the baseline market price of €1.355 per litre, in markets where all stations adopted.[62] Applying those percentages to the average U.S. retail price for the week of October 19, 2026—$4.284 per gallon of regular gasoline—yields increases of roughly 4 and 19 cents per gallon of gasoline.[63]

156. Moreover, when the Gas Station Defendants use Kalibrate Fuel Pricing to raise prices, it not only affects pricing at their individual stations—it also results in a softening of retail fuel competition across the markets where they do business. This results in higher gasoline prices for all consumers—not just the ones who buy fuel at the Gas Station Defendants' locations. The market-wide price increases that result from the Gas Station Defendants' use of Kalibrate Fuel Pricing are an intentional result of the software's operation, placing every consumer who purchased fuel in an area where Kalibrate Fuel Pricing is in use directly within the zone of foreseeable injury of Defendants' conduct.

157. The use of Kalibrate Fuel Pricing by multiple gas stations within a given geographic area exacerbates the anti-competitive effects of Defendants' unlawful conduct. When multiple competitors in an area surrender their pricing to Kalibrate Fuel Pricing, the algorithm effectively lifts the pricing floor for that entire territory. This localized manipulation forces up retail prices across all area distribution outlets, meaning that a Gas Station Defendant's use of Kalibrate Fuel

[62] Assad et al., author manuscript, at 5, 14 & tbl. 2, 26 & tbl. 5, 35 & tbl. 9.

[63] U.S. Energy Info. Admin., *Weekly Retail Gasoline and Diesel Prices*, https://www.eia.gov/dnav/pet/pet_pri_gnd_dcus_nus_w.htm (last visited Nov. 18, 2026) (reporting U.S. average retail prices of $4.284 per gallon for regular gasoline for the week of October 19, 2026).

Pricing will cause higher prices even for consumers who purchase from other gas stations. When Kalibrate advertises that its software is used by "8 of the top 10 fuel retailers in the USA," and 14 of the top 20 convenience store chains, it is communicating to potential customers that they too can benefit from Kalibrate's broad presence and amplify the effects of Kalibrate Fuel Pricing in their markets. Kalibrate's geographic saturation functions as a substantial factor in driving these market-wide overcharges, directly harming every consumer who buys fuel from any gas station within these locales, whether from a particular Gas Station Defendant or another area station.

158. Absent Court intervention, areas across the Class Area will continue to operate as no-competition zones, draining the budgets of drivers already feeling the pain at the pump. Because consumers are rooted in their local communities and bound by their geography, commuting daily to work and school, they have no choice but to continue making purchases in these rigged markets. The Court must enjoin this conduct to restore the fundamental right of every consumer to benefit from honest, free competition on the street corners of their local communities.

**IX. Defendants' Anticompetitive Conduct Has Harmed Plaintiffs**

159. Plaintiffs each have paid higher prices at the pump as a direct result of Defendants' use of Kalibrate Fuel Pricing to set retail gasoline prices.

160. Ms. Willis purchased gasoline at and directly from Wawa stations in and around Vineland, New Jersey during the Class Period and paid prices for that gasoline that were artificially inflated as a result of Defendants' conspiracy. Ms. Willis has been injured in her property as a result.

161. Mr. Simonich purchased gasoline at and directly from Speedway stations in and around Canton, Ohio during the Class Period and paid prices for that gasoline that were artificially inflated as a result of Defendants' conspiracy. Mr. Simonich has been injured in his property as a result.

**X. Defendants Concealed Their Conspiracy, Tolling the Limitations Period**

162. Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged

here until, at the earliest, June 2025, when The Capitol Forum first reported that leading U.S. fuel retailers were using Kalibrate's software to set fuel prices and the Competition Bureau of Canada's application record in its proceeding against Kalibrate became publicly available.

163. The conspiracy was inherently self-concealing. Kalibrate keeps the identities of most of its Kalibrate Fuel Pricing customers confidential, and its customer contracts have prohibited it from publicly identifying its customers, as Speedway's contract did. Kalibrate's price recommendations, and the competitively sensitive data underlying them, pass privately between Kalibrate and each customer. A motorist reading the price on a station's sign has no way to know that the price was generated by a common algorithm that also prices the station's rivals.

164. Defendants also affirmatively concealed the conspiracy. After the Competition Bureau of Canada began investigating it, and before the conspiracy came to light, Kalibrate publicly represented on its website, in a March 17, 2025 article, that each client operates with its own pricing models and rules, and it has represented in response to inquiries that Kalibrate Fuel Pricing for each customer is "exclusively based on data entered by that individual customer."[64] As alleged in paragraphs 130 to 135, Kalibrate has since expanded those assurances, representing through its website and its spokespersons that competing customers share no data or models, that customer data are "strictly segregated," and that there is "no interaction between competitors." These statements misled the public, including Plaintiffs and members of the Classes, about the nature of Kalibrate Fuel Pricing and the coordination it enabled.

165. Plaintiffs and members of the Classes exercised reasonable diligence. Retail motorists have no access to fuel retailers' pricing contracts, data, or software, and nothing about the prices they paid put them on notice of the conspiracy before June 2025. Because of Defendants' concealment, any applicable statute of limitations has been tolled. In addition, each sale at a price inflated by the conspiracy is an overt act that starts the limitations period anew as to that sale, and, under the New Jersey Antitrust Act, a claim based on a conspiracy accrues only when the plaintiff

---

[64] Letter from Counsel for Kalibrate to Competition Bureau (June 28, 2024), *reprinted in* Application Record, *supra* note 21, at 285.

discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the conspiracy, N.J. Stat. Ann. § 56:9-14.

## XI. Class Action Allegations

166. Plaintiffs Nichole Willis and Daryl Simonich bring this action for themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> **Gasoline Class:** All persons and entities who purchased gasoline at any of the Gas Station Defendants' gas stations in the Class Area where Kalibrate Fuel Pricing was in use from and including November 23, 2022 to the present (the "Class Period").

167. Ms. Willis also brings this action for herself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following subclass:

> **New Jersey Subclass:** All persons and entities who purchased gasoline in New Jersey at any of the Gas Station Defendants' gas stations where Kalibrate Fuel Pricing was in use during the Class Period.

168. Mr. Simonich also brings this action for himself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following subclass:

> **Ohio Subclass:** All persons and entities who purchased gasoline in Ohio at any of the Gas Station Defendants' gas stations where Kalibrate Fuel Pricing was in use during the Class Period.

169. The Gasoline Class, the New Jersey Subclass, and the Ohio Subclass are together the "Classes."

170. Specifically excluded from each Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; all State agencies; and any juror assigned to this action.

171. The Classes are each so numerous as to make joinder impracticable. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of geographically dispersed members in each Class.

172. Members of each Class are readily ascertainable from objective records. The Gas Station Defendants' point-of-sale records identify each transaction by station, date, product, volume, and price, and many transactions are linked to payment-card or loyalty-program identifiers. Kalibrate's records identify which stations used Kalibrate Fuel Pricing and when. Class members' own receipts and payment-card statements, together with affidavits, can be checked against those records.

173. Plaintiffs' claims are typical of the claims of the members of each Class. Plaintiffs and Class Members sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein. Because the core of this action centers on an algorithmic pricing conspiracy orchestrated through Kalibrate to systematically inflate retail fuel prices for all gas stations using Kalibrate Fuel Pricing, the financial injury inflicted upon the representative Plaintiffs is similar in nature to the injury suffered by every other member of the Classes.

174. Plaintiffs' claims arise out of the same course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust litigation.

175. Common questions of law and fact exist as to all members of the Classes. Plaintiffs and the Classes were injured by the same unlawful anticompetitive trust, Defendants' anticompetitive conduct is generally applicable to all members of the Classes, and relief to each Class as a whole is appropriate. Such questions of law and fact common to the Classes include, but are not limited to:

- Whether Defendants entered into a formal or informal combination, conspiracy, common understanding, or trust to suppress competition and inflate prices for the retail sale of gasoline;

- If Defendants entered into such formal or informal combination, conspiracy, common understanding, or trust, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;
- If Defendants entered into such formal or informal combination, conspiracy, common understanding, or trust, whether that conduct violates the Ohio Valentine Act and the New Jersey Antitrust Act;
- If Defendants entered into such formal or informal combination, conspiracy, common understanding, or trust, whether that conduct has artificially inflated the retail price of gasoline to supracompetitive levels;
- Whether the operation of Kalibrate Fuel Pricing and its algorithmic use of competitor data restrained price competition in the retail sale of gasoline;
- If the Court examines the conspiracy under a quick look or rule of reason analysis, whether retail gasoline is a relevant product market;
- The appropriate injunctive and related equitable relief; and
- The appropriate measure of classwide damages.

176. The questions of law and fact common to the members of each Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

177. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

178. The prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## VIOLATIONS ALLEGED

## COUNT ONE

### Contract, Combination, and Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1 et seq.)

179. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 178 as though fully set forth herein. Defendants' use of Kalibrate Fuel Pricing as a vehicle for fuel price manipulation constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

180. Defendants' conduct is unlawful *per se*. In the alternative, Defendants' conduct is unlawful under the quick look and the rule of reason. Under the rule of reason, Plaintiffs carry their initial burden through direct evidence of anticompetitive effects—increased prices and margins accompanied by reduced output in the relevant markets—and, in the alternative, through Defendants' market power in those markets. No procompetitive justification outweighs these harms, and any procompetitive benefits could have been achieved through less restrictive means.

181. Defendant Kalibrate has entered into contracts, combinations, trusts, and/or agreements with the Gas Station Defendants for the purpose and with the effect of preventing competition and artificially inflating, fixing, raising, and stabilizing the price of retail gasoline within the Class Area.

182. The Gas Station Defendants have entered and maintained a conspiracy—a coordinated trust—to fix, raise, and stabilize retail gasoline prices. This agreement among competitors is evidenced by the Gas Station Defendants' conscious commitment to common and collusive algorithmic pricing software, Kalibrate Fuel Pricing, with the shared understanding that their competitors were doing the same. By plugging their pricing into Kalibrate Fuel Pricing, as well as providing this centralized pricing agent with their competitively sensitive pricing, volume, and other data, the Gas Station Defendants replaced independent, street-corner competition with

an illegal, coordinated, automated pricing system to stop competing on price, and to fix and raise prices in tandem. This conscious use of the software to lessen competition is the common binding link which connects each of the Gas Station Defendants in this trust.

183. Additionally, each individual agreement between Kalibrate and each Gas Station Defendant constitutes an unlawful trust and an agreement to tamper with or fix prices. In these individual agreements, the Gas Station Defendants have provided proprietary, non-public, competitively sensitive price, volume, and other data, and have surrendered as much as 90% of their pricing decisions to Kalibrate's centralized pricing platform. Kalibrate in return provides the Gas Station Defendants with the certainty necessary to anticompetitively raise prices without fearing the loss of customer volume.

184. Kalibrate distributes and Kalibrate and the Gas Station Defendants use a common pricing algorithm within the meaning of Section 1 of the Sherman Act. By utilizing this common pricing algorithm, Defendants have replaced independent competitive decision-making with a centralized, coordinated pricing mechanism.

185. As a direct result of these competitor agreements and individual contracts, combinations, trusts, and/or agreements, competition in the retail gasoline markets throughout the Class Area has been restrained, and prices have been maintained at supracompetitive levels.

186. Plaintiffs and members of each Class have been forced to pay an illegal surcharge at the pump as a result of Defendants' conduct, causing them significant economic injury. Plaintiffs and members of each Class have been injured in their business or property by reason of Defendants' violation of Section 1 of the Sherman Act.

187. Plaintiffs and members of the Gasoline Class are entitled to treble damages, costs of suit, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT TWO**

**Information Exchange in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(*In the Alternative to Count One, on Behalf of Plaintiffs and the Gasoline Class Against All Defendants*)**

188. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 178 as though fully set forth herein.

189. During the Class Period, Defendants entered into a continuing agreement to regularly exchange detailed, timely, granular, competitively sensitive, and non-public information through Kalibrate Fuel Pricing, including station-level prices, costs, sales volumes, and margins. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

190. Each Gas Station Defendant agreed with Kalibrate to provide Kalibrate its non-public data, knowing that Kalibrate would process that data in conjunction with data about competing stations, including stations operated by other Gas Station Defendants, to generate price recommendations not only for that Gas Station Defendant but for its competitors, and vice versa. Kalibrate pooled the data it received with its own proprietary market data, including site-level competitor prices, volumes, market share, and performance, and used the pooled data to model how competing stations would react to a price change. The Gas Station Defendants thereby joined together in a way that deprived the relevant markets of independent centers of decision-making on price.

191. The relevant markets are the retail sale of gasoline in the local geographic markets alleged in paragraphs 88 through 103. Those markets are characterized by inelastic demand, fungible products, and high barriers to entry, as alleged in paragraphs 105 through 109. In each relevant market, Kalibrate and the Gas Station Defendants using Kalibrate Fuel Pricing collectively have sufficient market power to harm competition.

192. The information exchanged through Kalibrate was a material factor in the Gas Station Defendants' pricing decisions. It reduced the uncertainty that would otherwise have disciplined each Gas Station Defendant's prices and allowed the Gas Station Defendants to

anticipate and accommodate one another's prices rather than undercut them. As a result, as alleged in paragraphs 104 and 140 through 155, retail gasoline prices and margins rose while volumes fell.

193. The exchange was not reasonably necessary to further any procompetitive purpose, and any procompetitive benefits could have been achieved through less restrictive means. The anticompetitive effects of the exchange outweigh any procompetitive benefits.

194. As a direct and proximate result of the exchange, competition in the relevant markets was reduced and suppressed, and Plaintiffs and members of the Gasoline Class paid artificially inflated prices for retail gasoline and have been injured in their property.

195. Plaintiffs and members of the Gasoline Class are entitled to treble damages, costs of suit, and reasonable attorneys' fees under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT THREE**

**Violation of the Ohio Valentine Act (Ohio Rev. Code Ann. §§ 1331.01, 1331.04, 1331.08)**
**(*On Behalf of Mr. Simonich and the Ohio Subclass Against All Defendants*)**

196. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 178 as though fully set forth herein.

197. Mr. Simonich brings this claim on behalf of himself and the Ohio Subclass.

198. The Valentine Act provides that "[e]very combination, contract, or agreement in the form of a trust is declared to be a conspiracy against trade and illegal." Ohio Rev. Code Ann. § 1331.04. A trust includes a combination by which persons "agree in any manner to keep the price of such article, commodity, or transportation at a fixed or graduated figure." Ohio Rev. Code Ann. § 1331.01(C)(1)(e).

199. Defendants entered into and maintained a combination, contract, and agreement in the form of a trust, as alleged above, by which they agreed to fix, raise, and stabilize the retail prices of gasoline, including at the Gas Station Defendants' stations in Ohio where Kalibrate Fuel Pricing was in use. Defendants' conduct is unlawful *per se* and, in the alternative, unlawful under the quick look and the rule of reason, for the reasons alleged in Count One.

200. Defendants' conduct had substantial effects in Ohio. Gas Station Defendants, including Speedway and Murphy Oil USA, operate stations in Ohio at which Kalibrate Fuel Pricing was in use, and Mr. Simonich and members of the Ohio Subclass purchased gasoline directly from the Gas Station Defendants at those stations at prices artificially inflated by Defendants' conduct.

201. As a direct and proximate result of Defendants' conduct, Mr. Simonich and members of the Ohio Subclass have been injured in their business or property and are entitled to recover treble the damages they sustained and their costs of suit under Ohio Rev. Code Ann. § 1331.08. Each Defendant is jointly and severally liable for the injuries caused by the conspiracy, including overcharges on sales made by its co-conspirators.

**COUNT FOUR**

**Violation of the New Jersey Antitrust Act (N.J. Stat. Ann. §§ 56:9-3, 56:9-12)**
**(*On Behalf of Ms. Willis and the New Jersey Subclass Against All Defendants*)**

202. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 178 as though fully set forth herein.

203. Ms. Willis brings this claim on behalf of herself and the New Jersey Subclass.

204. The New Jersey Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." N.J. Stat. Ann. § 56:9-3. The Act is construed "in harmony with ruling judicial interpretations of comparable Federal antitrust statutes." N.J. Stat. Ann. § 56:9-18.

205. Defendants entered into and maintained a contract, combination, and conspiracy in restraint of trade and commerce in New Jersey, as alleged above, to fix, raise, and stabilize the retail prices of gasoline, including at the Gas Station Defendants' stations in New Jersey where Kalibrate Fuel Pricing was in use. Defendants' conduct is unlawful *per se* and, in the alternative, unlawful under the quick look and the rule of reason, for the reasons alleged in Count One.

206. Defendants' conduct restrained trade and commerce in New Jersey. Gas Station Defendants, including Wawa and QuickChek, operate numerous stations in New Jersey at which Kalibrate Fuel Pricing was in use, and Ms. Willis and members of the New Jersey Subclass

purchased gasoline directly from the Gas Station Defendants at those stations at prices artificially inflated by Defendants' conduct.

207. As a direct and proximate result of Defendants' conduct, Ms. Willis and members of the New Jersey Subclass have been injured in their business or property and are entitled to recover "not less than $1,000 or threefold the damages" they sustained, with interest, "whichever amount is greater, together with reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. Stat. Ann. § 56:9-12(a). Ms. Willis and members of the New Jersey Subclass are also entitled to injunctive relief under N.J. Stat. Ann. § 56:9-10(b). Each Defendant is jointly and severally liable for the injuries caused by the conspiracy, including overcharges on sales made by its co-conspirators.

## REQUEST FOR RELIEF

208. Wherefore, Plaintiffs, on behalf of themselves and a class of all others similarly situated, respectfully request that the Court enter an order or judgment against Defendants including the following:

a. For certification of this proceeding as a class action;

b. For appointment of Plaintiffs as class representatives and their counsel as class counsel;

c. That Defendants' conduct be adjudged and decreed to violate the laws alleged herein;

d. That Plaintiffs and the Class Members recover compensatory and treble damages, or statutory minimum damages where greater, as provided by law;

e. For attorneys' fees to Plaintiffs and the Classes as provided by law;

f. For costs and expenses as provided by law;

g. For permanent injunctive relief to Plaintiffs and the Classes;

h. For pre- and post-judgment interest upon each of the foregoing; and

i. For all other such relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

209. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Complaint so triable.

Dated: November 25, 2026

Respectfully Submitted,

*/s/ Paul Scarlato*
Paul Scarlato (PA Bar No. 47155)
ROSCA SCARLATO LLC
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (216) 946-7070
pscarlato@rscounsel.law

Constantine P. Economides (*pro hac vice* forthcoming)
Michael B. Homer (*pro hac vice* forthcoming)
Yusef Al-Jarani (*pro hac vice* forthcoming)
Casandra Ferrante (*pro hac vice* forthcoming)
DYNAMIS LLP
175 Federal St., Suite 1200
Boston, MA 02110
Telephone: (617) 693-9732
ceconomides@dynamisllp.com
mhomer@dynamisllp.com
yaljarani@dynamisllp.com
cferrante@dynamisllp.com

Alexandra Bernay (*pro hac vice* forthcoming)
Arthur L. Shingler III (*pro hac vice* forthcoming)
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: (619) 231-1058
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

Stuart A. Davidson (*pro hac vice* forthcoming)
Mark J. Dearman (*pro hac vice* forthcoming)
ROBBINS GELLER RUDMAN
& DOWD LLP
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432

Telephone: (561) 750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com

Rex A. Sharp (*pro hac vice* forthcoming)
W. Greg Wright (*pro hac vice* forthcoming)
Ryan C. Hudson (*pro hac vice* forthcoming)
Hammons P. Hepner (*pro hac vice* forthcoming)
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
Tel.: 913-901-0505
Fax: 913-261-7564
rsharp@midwest-law.com
gwright@midwest-law.com
rhudson@midwest-law.com
hhepner@midwest-law.com

*Counsel for Plaintiffs and the Classes*